IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HERBERT FREITAG,

               Plaintiff,

    v.

CAPITAL ONE SERVICES, LLC,

               Defendant.

OPINION AND ORDER

15-cv-810-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Herbert Freitag brought this action against his former employer, defendant Capital One Services, LLC, alleging that defendant fired him because of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634.  Plaintiff contends that he was subjected to ageist hostility from his direct supervisor, Steven Cambra, and that this discrimination was the impetus for his termination.  Defendant says that plaintiff was fired because of poor performance, including unprofessional and disrespectful behavior toward colleagues and subordinates.

Defendant has filed a motion for summary judgment, dkt. #24, which I am granting because the undisputed facts demonstrate that defendant fired plaintiff because senior decision makers concluded from several employee complaints and inquiries by the human resources department that his performance and behavior warranted dismissal.  The undisputed record would not permit a rational factfinder to conclude that plaintiff's age was

1

the reason or the "but-for" cause of his termination. Accordingly, defendant is entitled to judgment as a matter of law.

From the parties' proposed findings of fact and the record, I find that the following facts are not subject to genuine dispute, except where expressly indicated otherwise.

## UNDISPUTED FACTS

### A. Plaintiff's Employment History with Defendant

Plaintiff Herbert Freitag began his employment with defendant Capital One Services, LLC, on May 1, 2012, when Capital One acquired a credit card partnership business unit from HSBC, where plaintiff had been employed as a vice president of sales and client development since 2005. Starting in May 2012, when plaintiff was 62 years old, his job title at Capital One was senior manager in client development. Of the roughly two dozen senior managers in Capital One's credit card division, plaintiff was the oldest and the others were mostly in their 30s and 40s. Plaintiff's boss and direct supervisor at Capital One was director of client development Steven Cambra, who had been supervising plaintiff at HSBC since 2007. Cambra was in his 40s during the time he was managing plaintiff.

At Capital One, plaintiff continued working on the Menards client account, providing credit card relationship services to Menards home improvement stores. His primary office space was located at the Menards store in Eau Claire, Wisconsin. One of plaintiff's assignments at Capital One was to manage a team of approximately 8 to 10 regional sales associates for the Menards account, who all reported to him. Some of these associates,

including Linda Alexander and Scott Milsteadt, found plaintiff to be an excellent manager and a fair boss who acted professionally at all times that they personally worked together. Others, as discussed below, complained of problems they experienced while working under him. Plaintiff also submitted evidence that he had received positive peer reviews from several other colleagues, and that he had received generally positive performance evaluations from Cambra from 2009 to 2012.

At times, Cambra has inquired, joked or made derogatory comments about plaintiff's older age. (Plaintiff alleges that this occurred frequently, both before and after May 2012, including at monthly meetings with the Menards management team and around other HSBC and Capital One staff. Plaintiff says, for example, that at various times Cambra called him "grandpa," "gray hair," "silver hair," "old man" and asked him "did you have your Geritol today?" Defendant denies that Cambra made these comments.) Cambra admitted asking plaintiff on at least one occasion how old he was, when he planned on retiring and also if he was "having a senior moment." Dft.'s Response to Plt.'s PFOF, Dkt. #39, ¶¶ 55-71.

In January 2013, plaintiff and Cambra decided to create two mid-management positions beneath plaintiff and to promote two regional sales associates to fill them. They selected and promoted Terence Able (who was then 62 years old) and Beth Johnson (who was in her mid-40s) to fill the positions, in which they would each manage half of the other regional sales associates.

## B. <u>Dyck Incident and Plaintiff's Performance Improvement Plan</u>

Beginning early in 2013, problems arose with a sales associate on plaintiff's team, Ryan Dyck, who was caught by plaintiff allegedly using his company credit card for unauthorized personal purchases. When these purchases continued after Dyck was reprimanded, plaintiff reported it to his superiors, and Dyck was placed on medical leave. Dyck also reportedly brought firearms, alleged illegal drug paraphernalia and other dangerous or inappropriate items to his Capital One office in the Menards facility. A corporate security officer was assigned to investigate the situation and a consultant from the human resources team, Julie Traff, was also assigned to provide plaintiff assistance and recommendations for handling Dyck's employment situation going forward. Ultimately, after Traff consulted with corporate security, Cambra and her superiors in HR, Dyck was recommended for termination.

While Dyck was on medical leave, he contacted the human resources department to complain about the way plaintiff had treated him. Dyck was a military veteran who had told plaintiff and others at Capital One that he was suffering from post-traumatic stress disorder and related health and family problems. Among other things, Dyck complained that plaintiff had been rude and insensitive to him, had used profanity and had questioned him about his medical condition and treatment. Dyck also alleged that plaintiff had told him that he could go out and hire someone else "who doesn't have a fucked-up mind." A separate human resources consultant, Sandi Frey, was assigned to investigate Dyck's complaints regarding plaintiff's allegedly inappropriate behavior. During this investigation, Traff contacted Frey

to inform her that during Traff's review of Dyck's alleged misconduct, plaintiff was uncooperative and difficult to work with, had behaved unprofessionally and had difficulty managing his reactions and emotions. On March 25, 2013, Frey "coached" plaintiff with respect to these problems, emphasizing the important of professionalism and reiterating the company's expectations of him.

Frey reported the results of her investigation to her managers, including senior human resources director Sarah Mankowski, who reviewed the information alongside plaintiff's 2012 performance review. Plaintiff's 2012 performance review assigned him a rating of "very strong" on "results," but his overall rating was only "strong," because of an "inconsistent" grade on his communications and teamwork competencies. (The performance evaluation graded employees on individual competencies and overall ratings on a grading scale from "inconsistent," to "strong," to "very strong," to "exceptional.") Relying on the feedback from Frey's investigation, including the input from Traff, and the issues previously identified in plaintiff's 2012 performance review, Mankowski recommended placing plaintiff on a performance improvement plan. (A performance improvement plan is a written documentation of a performance issue that outlines a problem, the company's expectations for addressing it and sets a formal process and timeline to give the employee an opportunity to improve.)

Cambra agreed with Mankowski's recommendation and issued a performance improvement plan for plaintiff on May 3, 2013. In the written plan, Cambra notified plaintiff that "his performance does not meet expectations," and that he would have 60 days

to demonstrate improvement, or his employment could be terminated. The "plan due date" was recorded as July 12, 2013. On May 6, 2013, Cambra sent plaintiff an email about his performance improvement plan. Cambra wrote: "You haven't had many issues with competencies in the past therefore I don't expect you to not get through a 60 day period. So yes, I think it's a blip and something you can overcome with a little effort on approach."

## C. Keaton Complaint

Sometime between May 6 and May 8, 2013, Mankowski learned of a complaint by an employee regarding Cambra's behavior and use of profanity. Mankowski assigned RoseAnn Golden to investigate this complaint and concerns about the work environment under Cambra. Golden spoke with three female employees including Tiffany Keaton, a member of the marketing team, who relayed several complaints about unprofessional and disrespectful behavior. First, Keaton alleged that Cambra approached her and other marketing team members who were watching a video at a Capital One event and asked whether they were "making another adult video." Second, Keaton alleged that Cambra had inappropriately ordered a round of shots called "used condoms" for colleagues at a bar in Eau Claire, although this took place in April 2012 before the business unit was sold from HSBC to Capital One. Third, Keaton alleged that on one occasion plaintiff had stroked her knee inappropriately, and that she had reported this to Cambra, but Cambra simply responded, "You can't teach a dog new tricks." After reviewing Golden's report from her investigation, Mankowski recommended that Cambra undergo "coaching" but did not recommend an

official performance improvement plan because Cambra had no preexisting record of similar problems, either on his 2012 performance review or otherwise. Mankowski met with Cambra on May 16, 2013, to coach him regarding his use of profane language and the importance of setting a professional tone and maintaining an appropriate team work environment. No action was taken with respect to plaintiff and the inappropriate touching Keaton had alleged.

### D. Olson and Millsap Complaints

On June 28, 2013, an anonymous caller reported to Capital One's ethics hotline two other incidents in which plaintiff had allegedly behaved unprofessionally or inappropriately toward two other regional sales associates. Frey was again assigned to investigate these allegations, and she spoke with plaintiff, Abell and the two targets of plaintiff's alleged behavior, Patricia Olson and Austin Millsap.

Olson reported to Frey that at a Menards store opening event on June 24, 2013, plaintiff had followed her to the restroom and then aggressively confronted her when she came out. Olson said that plaintiff told her "I am getting fucking complaints about you," and demanded to know "why the hell are you not at your post?" When Olson began crying, she alleged that plaintiff asked her, "Are you going to stand there and bawl or are you going to get back to work?" Abell also told Frey separately that he had seen Olson crying at the event and that she had told him this same story soon after the confrontation with plaintiff, although he did not witness the confrontation itself.

Millsap told Frey about two incidents. First, at an evening work event in April 2013, Millsap alleged that plaintiff grabbed Millsap's arm in front of a group of people, pulled him aside and told him that he was not in the mood for his "shit," after Millsap declined plaintiff's invitation to dinner because he was not feeling well. Second, Millsap alleged that when he informed plaintiff in December 2012 that he would be taking paternity leave, plaintiff said that he would have to look into the rules on that issue. When Millap offered to get a copy of the rules from the human resources department, plaintiff responded that "there are written rules and unwritten rules."

More generally, Millsap told Frey that plaintiff managed by intimidation and negatively influenced the morale of the entire sales team. Both Millsap and Olson compared plaintiff to an "abusive spouse" in the way he dealt with colleagues and subordinates. Frey also interviewed plaintiff, who acknowledged minor confrontations with Olson and Millsap, but denied most of the specific statements in their accounts and provided his own side of the story with counter-allegations. Frey reported the results of her investigation back to Golden and Mankowski

E.  Conclusion of Performance Improvement Plan and Plaintiff's Termination

On or about July 6, 2013, a few days before plaintiff's performance improvement plan "due date," Cambra told plaintiff in a phone call that plaintiff had successfully completed the plan. Also on July 6, Cambra made written comments on plaintiff's plan documentation, stating that plaintiff "has worked diligently to improve his communication competency gaps.

I have not received any complaints from anyone since this PIP was created and have even received some positive comments about how good he has been to work with." Dkt. #39, ¶¶ 216-17. Cambra also told Mankowski that plaintiff was making progress on his performance improvement plan and had been responsive to feedback.

Mankowski reviewed the findings of Frey's investigation of the most recent complaints and discussed them with Golden. They discussed whether plaintiff was ever going to change his behavior, and whether the repeated complaints against plaintiff were putting the company at risk. Frey never had a problem dealing with plaintiff personally, and her perspective was that plaintiff generally wanted to do the right thing, but it never seemed to come out the right way. Frey communicated this during a phone conversation with Mankowski and Golden. After reviewing the investigation results, performance improvement plan and prior performance review, Mankowski made a recommendation that plaintiff be terminated.

Mankowski relayed this recommendation to Cambra in an email dated July 22, 2013. Cambra responded: "Am I reading this correctly that the human resource recommendation that we terminate [plaintiff]?" Dkt. # 34-2, at 4. Mankowski also recommended plaintiff's termination to Bryan Powell, vice president of the Menards account, and Rick Elliot, senior vice president of partnerships. (Mankowski testified that she emailed her termination recommendation to Powell and Elliot *before* emailing it to Cambra on July 22, and that she did so both because Cambra was in the process of being transferred to a different account and because she had doubts about his judgment with respect to plaintiff. Plaintiff disputes

that account and timeline, noting a conspicuous lack of email documentation to corroborate it.)  Powell knew that plaintiff had been on a performance improvement plan, and he agreed with Mankowski's recommendation to terminate plaintiff.  Powell had no independent basis for the decision to terminate at that time; he relied on Mankowski's recommendation.  Elliot received the same recommendation from Mankowski and another member of the human resources department.  The information and feedback he had received regarding plaintiff and Mankowski's recommendation led him to believe that termination would be the best course of action.  Neither Powell nor Elliot sought any input or recommendation from Cambra.  Powell then delivered his and Elliot's concurring recommendation to Cambra.

(Elliot and Mankowski both testified that Elliot was the ultimate decision maker regarding plaintiff's termination, but plaintiff disputes that, citing later statements by defendant in an administrative proceeding and testimony by Cambra suggesting that Cambra made the decision, or at least approved it.  The deposition testimony and other evidence do not make it entirely clear whether Powell presented the "recommendation" to Cambra for his approval, whether Cambra actually possessed the authority and discretion to follow or not follow the recommendation from his superiors or whether it was a final decision that was merely handed down for Cambra to relay in his role as plaintiff's supervisor.)

On August 9, 2013, Cambra and Mankowski together delivered the termination decision to plaintiff in person in a conversation that lasted between ten minutes and one hour.  At that meeting, Cambra told plaintiff that he was being terminated, using a script prepared and provided by human resources for that purpose.  Mankowski reviewed

defendant's severance offer and went over other documentation with plaintiff.

After plaintiff's termination, Anne Hofer took over some of his responsibilities and Abell and Johnson (the regional sales associates who had previously been promoted to mid-management positions) took over others. Hofer had learned in March 2013 that she would be taking over Cambra's role as director of client development for the Menards account, as Cambra was preparing to move into a new job. Hofer came from another Capital One client account, and she had already begun preparing to assume Cambra's role as director when plaintiff was fired, although she did not fully take over until September 2013. Hofer was informed by Powell that plaintiff was being terminated shortly before it happened. She played no role in the decision to fire plaintiff. Hofer was approximately 48 years old in 2013.

On June 4, 2014, plaintiff filed an age discrimination complaint with the Wisconsin Department of Workforce Development, Equal Rights Division. On July 11, 2014, defendant filed a position statement in response, which was prepared by Capital One senior counsel, Dana Dews Gates. In that position statement, appearing twice on the same page is the assertion that "Cambra made the decision to terminate" plaintiff. Dkt. #39, ¶¶ 235-36. Cambra, Mankowski and Powell lacked any knowledge of Dana Dews Gates and never provided any input into the statement she included in the position statement. Plaintiff filed this federal action on December 18, 2015.

# OPINION

Defendant has moved for summary judgment, contending that plaintiff has failed to adduce evidence sufficient to support his age discrimination claim. Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering defendant's motion for summary judgment, I must credit plaintiff's evidence and draw all reasonable inferences in his favor. Id. at 255. In opposing defendant's motion, plaintiff "does not bear the burden of *proving* his case," but to defeat a properly supported motion for summary judgment he must adduce "evidence that can be put in an admissible form at trial, and that, if believed by the factfinder, could support judgment in his favor." Marr v. Bank of America, N.A., 662 F.3d 963, 966 (7th Cir. 2011).

## A. Legal Standard for Age Discrimination Claim

The Age Discrimination in Employment Act (ADEA) provides in relevant part that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The Supreme Court has held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the

'reason' that the employer decided to act." <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S. 167, 176 (2009). "It follows, then, that under § 623(a)(1), the plaintiff . . . must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." <u>Id.</u> at 177-78. The only employer decision that plaintiff challenges as discriminatory is his termination, so the question presented is whether plaintiff has put forth enough evidence to allow a reasonable factfinder to conclude that plaintiff's age was the "but-for" cause of his termination or, in other words, that plaintiff would not have been fired but for his age.

As plaintiff observes, the Court of Appeals for the Seventh Circuit has made the point that there is no meaningful legal distinction between claims sought to be proven by "direct" rather than "circumstantial" evidence when it comes to evaluating employment discrimination claims of this kind. The standard on summary judgment is simply whether the entire body of evidence would permit a reasonable factfinder to conclude that the plaintiff's age (or other protected status) caused him to be discharged (or suffer some other adverse action). <u>Ortiz v. Werner Enterprises, Inc.</u>, 834 F.3d 760, 765 (7th Cir. 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'").

As discussed below, plaintiff presents his claim within the burden-shifting framework

set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Although I will evaluate plaintiff's contentions in the form in which he presents them, I note that that the interpretive framework does not displace or alter the basic underlying legal standard laid out above, as the court of appeals recently reiterated:

> As we have explained, both before and after Ortiz, McDonnell Douglas is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases. See, e.g., Volling v. Kurtz Paramedic Servs., Inc., 840 F.3d 378, 383 (7th Cir. 2016) (observing that a "prima facie case in Title VII litigation . . . refers to a *common, but not exclusive*, method of establishing a triable issue of intentional discrimination" (emphasis added) (internal quotation marks omitted)); Morgan v. SVT, LLC, 724 F.3d 990, 997 (7th Cir. 2013) (explaining that "the original purpose of McDonnell Douglas . . . was to outline a series of steps that, if satisfied, would support a plaintiff's right to reach a trier of fact"). As Ortiz and our other case law make clear, however, McDonnell Douglas is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?

David v. Board of Trustees of Community College District No. 508, 846 F.3d 216, 224 (7th Cir. 2017). Thus, however the claim is presented, the core legal inquiry remains the same and the operative question still boils down to whether plaintiff has adduced sufficient evidence to allow a reasonable factfinder to conclude that defendant fired plaintiff because of his age, and that plaintiff's age was the but-for cause of his discharge.

## B. Burden-Shifting Analysis

Plaintiff contends that his evidence supports an age discrimination claim under the McDonnell Douglas framework, in which the plaintiff has the initial burden of establishing

that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. Keeton v. Morningstar, Inc., 667 F.3d 877, 884 (7th Cir. 2012) (citing McDonnell Douglas, 411 U.S. 792). If the plaintiff satisfies his burden to establish a prima facie case for discrimination, "then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." David, 846 F.3d at 225 (quoting Andrews v. CBOCS West, Inc., 743 F.3d 230, 234 (7th Cir. 2014), overruled on other gds. by Ortiz, 834 F.3d at 765).

As plaintiff notes, these inquiries overlap in many cases. I agree that it makes sense to "skip the analysis of . . . plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." Adelman-Reyes v. Saint Xavier University, 500 F.3d 662, 665–66 (7th Cir. 2007) (citing Abioye v. Sundstrand Corp., 164 F.3d 364, 368 (7th Cir. 1998)). Accordingly, I will look first to defendant's stated rationale for the termination and the evidence supporting it.

1. Legitimate, nondiscriminatory reasons for termination

Defendant asserts that plaintiff was fired because his performance was poor, and he did not cooperate or communicate well with colleagues. Moreover, his behavior toward subordinates was unprofessional and disrespectful. The record is replete with evidence that

in the months leading up to August 2013, defendant received several consecutive complaints or reports about plaintiff with allegations illustrating these problems. These included the Dyck complaint; the negative report from Traff about her investigation of Dyck's misconduct; the prior review of plaintiff's teamwork and communication deficiencies; the performance improvement plan; the Keaton complaint; and the anonymous ethics hotline call that prompted the Olson and Millsap complaints. The record demonstrates that defendant attempted to address these problems and incidents with performance evaluation and improvement processes, coaching, investigations by human resources personnel and ultimately termination. Thus, I conclude that defendant has more than adequately met its burden to provide a legitimate, non-discriminatory reason for firing plaintiff. The crucial question in this case is how that rationale stands up to plaintiff's contention that it was not the *real* reason defendant terminated him.

### 2. Pretext

Plaintiff contends that the reasons offered by defendant for his termination are mere pretext for discrimination, and that he was *really* fired because of his age. He has the burden of supporting this contention with evidence that could be believed by a factfinder. <u>David</u>, 846 F.3d at 225. "To establish pretext, [plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." <u>Boumehdi v. Plastag Holdings,</u>

LLC, 489 F.3d 781, 791–92 (7th Cir. 2007) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).  However, if defendant sincerely believed the reasons it gave for the termination, plaintiff's case fails "even if the reasons were foolish, trivial, or baseless."  Id.  See also McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.")

Plaintiff attempts to show pretext by arguing that defendant's proffered reasons for the termination (and associated details) are inconsistent, contradictory or untrue. Emphasizing defendant's position statement to the Equal Rights Division (which defendant later sought to correct), plaintiff argues that defendant has been inconsistent as to who ultimately made the termination decision.  There appears to be a genuine dispute, or at least a lack of clarity, about whether it was Cambra, Elliot, Powell, Mankowski or some combination of those individuals, who ultimately had the authority and discretion to make the decision to terminate plaintiff's employment.  I am not persuaded by defendant's arguments that the Equal Rights Division position statement is inadmissible and cannot be considered, but I also do not give it much evidentiary weight in these circumstances.  E.g. McCoy, 957 F.2d at 373 ("[T]his court is reluctant to give substantial weight to a position taken in adversary proceedings before the Department [of Human Services addressing administrative complaint for age-based demotion].  Myriad factors undoubtedly influence the positions taken in such a forum.").  This is especially true where the position statement

was drafted by a corporate counsel who apparently did not speak to the people involved in the termination. Some of the assertions in that statement are taken out of context and have since been amended or corrected, and the testimony of some key witnesses casts doubt on the reliability of the statement. More important, this dispute or lack of clarity as to which individual or individuals made the final decision has very little relevance in these circumstances, because it does not directly speak to the question whether the rationale defendant gave for firing plaintiff was a sham or a pretext for discrimination.

Plaintiff also attacks the reasons for the termination more directly. He argues that Mankowski's, Powell's, Frey's and others' explanations of the termination rationale are inconsistent. But plaintiff's criticism is that different witnesses describing that rationale at different times variously emphasized his poor communication or "people skills," his alleged behavior in particular incidents or complaints, his failure to change or improve his performance after being placed on the improvement plan or the human resources department's recommendation to terminate him. These are all manifestations of the same overall pattern of alleged unprofessional conduct that defendant asserts was at the root of defendant's concerns and its ultimate decision to terminate plaintiff. The differing explanations merely indicate differing points of emphasis. None of the examples plaintiff highlights are contradictory, so they do not indicate pretext. O'Connor v. DePaul University, 123 F.3d 665, 670-71 (7th Cir. 1997).

Similarly, plaintiff's attacks on the way defendant evaluated his performance, allegedly failed to properly follow its own policies or procedures and the way it investigated

the complaints about plaintiff's alleged misconduct, get him nowhere unless he can show that these things were not done in good faith. Ransom v. CSC Consulting, Inc., 217 F.3d 467, 471 (7th Cir. 2000). Incomplete or inadequate investigation into a complaint of misconduct is not an indication of pretext, as it is not "the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." Ineichen v. Ameritech, 410 F.3d 956, 961 (7th Cir. 2005) (quoting Ransom, 217 F.3d at 471). See also O'Connor, 123 F.3d at 670-71 ("DePaul's response to O'Connor's conduct may well have been extreme or unwarranted, and according to O'Connor, it may even have violated DePaul's own personnel guidelines. But none of that is determinative here. For purposes of the ADEA, we may not be concerned with whether the decision was right or wrong, fair or unfair, well-considered or precipitous. We must look only at whether the reason was discriminatory or, in the pretext analysis, whether it actually did underlie the plaintiff's termination."). In any event, plaintiff does not actually show that defendant's investigation or evaluation of him violated its own policies or procedures, and he certainly does not show that defendant's investigation was undertaken in an attempt to create a pretext for discrimination. Thus, in the absence of any evidence to call into question the legitimacy of the investigations or the good faith of defendant's attempts to address the problems raised, I must reject plaintiff's arguments that the investigations were not sufficiently fair or thorough or that they came to incorrect or misguided conclusions.

Naturally, plaintiff places great emphasis on Cambra's allegedly derogatory, belittling

comments about plaintiff's age. For purposes of summary judgment, I must accept plaintiff's version of what Cambra said to or about him, even though Cambra sharply disputes that version. As noted above, the parties also dispute who was the "ultimate" decision maker in plaintiff's termination, but for purposes of summary judgment, plaintiff has adduced enough evidence to show that Cambra was at least a part of the decision making process. Of course, Cambra was also plaintiff's direct supervisor, as well as the only person who, according to plaintiff, made ageist remarks. Plaintiff maintains that Cambra had a demonstrated animus against plaintiff because of his age, and this must have infected the decision making process and the ultimate decision to terminate.

Defendant minimizes Cambra's comments as mere irrelevant "stray remarks," but plaintiff has submitted evidence from which a factfinder could easily infer that the remarks were more than that. Indeed, plaintiff says that some of these derogatory remarks from Cambra were repeated, even regular, insults targeting him because of his age. He maintains that they were stronger and more sustained than the kinds of "ambiguous or isolated comments" that the court of appeals has sometimes dismissed as a possible indication of discrimination. Hobgood v. Illinois Gaming Board, 731 F.3d 635, 644 (7th Cir. 2013) (collecting cases). The court has emphasized that such comments must not be evaluated in isolation, but in the context of all of the other evidence in the record. Id.; see also Prochaska v. Menard, Inc., 829 F. Supp. 2d 710, 726 (W.D. Wis. 2011).

The problem with plaintiff's claim is that he has adduced no evidence suggesting that defendant's decision to terminate plaintiff was affected by any bias or ill will Cambra may

have harbored toward him. Plaintiff has not alleged that anyone other than Cambra ever said or did anything suggesting ageist animus against him or that any of the other decision makers had any discriminatory motive for their actions or recommendations. Most of Cambra's comments that plaintiff describes as "an ongoing campaign of harassment," dkt. #37 at 20, occurred significantly earlier than any contemplated employment action and had no demonstrated connection with the termination decision. Plaintiff focuses misleadingly on one comment by Cambra that "You can't teach a dog new tricks," repeatedly suggesting that it was evidence that Cambra believed plaintiff could not keep up with his responsibilities because of his age. However, the undisputed evidence shows that the comment was made in an entirely different context: in Cambra's response to Keaton's complaint that plaintiff had stroked her knee inappropriately, which Cambra allegedly did nothing to address. Given the true context of that statement, it is a curiously unhelpful one for plaintiff to highlight. If anything, the comment suggests that on that occasion Cambra treated plaintiff *more* favorably because of his age.

Regardless what Cambra may have said, it remains the case that "fundamentally the plaintiff must connect the circumstantial evidence to the employment action such that a reasonable juror could infer the employer acted for discriminatory reasons." Fleishman v. Continental Casualty Co., 698 F.3d 598, 603 (7th Cir. 2012) (citing Rhodes v. Illinois Department of Transportation, 359 F.3d 498, 504 (7th Cir. 2004)). All evidence of the decision making process involving Cambra, Elliot, Powell, Mankowski and others in human resources suggests that the only topics discussed regarding plaintiff's potential termination

had to do with his performance and the concerns about his conduct, as already outlined at length. That includes the discussion among Mankowski, Frey and Golden about whether they believed plaintiff was going to change or whether they could expect continued behavior of the kind that led to complaints. In the context of this decision making process, the undisputed evidence shows that Cambra himself was the only one who thought plaintiff's performance had improved, and that he was surprised when he learned that Mankowski and her department were recommending plaintiff's termination. Indeed, the evidence actually suggests that Cambra was plaintiff's strongest advocate with respect to his performance improvement plan. This is far from what one would expect if Cambra's age bias or animus toward plaintiff were really influencing the decision making process. Plaintiff fails to address this and other major inconsistencies in his claim that discrimination drove defendant's decision to fire him.

Plaintiff has not presented any evidence from which a rational factfinder could conclude that defendant's investigations into plaintiff's alleged misconduct or the performance evaluation processes were a sham, a manifestation of bad faith or a false reason for firing plaintiff. Plaintiff cannot demonstrate pretext, and cannot defeat defendant's motion for summary judgment on that basis. Ineichen, 410 F.3d at 961.


C. The Evidence Would Not Permit a Reasonable Factfinder to Infer that Plaintiff Was Terminated Because of His Age

Because plaintiff cannot demonstrate that defendant's proffered reason for firing him

was pretextual, he cannot satisfy the <u>McDonnell Douglas</u> test. Thus, I need not evaluate whether plaintiff's evidence presents a prima facie case under that framework. As noted earlier in the opinion, the <u>McDonnell Douglas</u> framework is not the exclusive way to support a discrimination claim, <u>David</u>, 846 F.3d at 224, and although plaintiff primarily emphasizes that burden-shifting framework, some of the evidence and arguments reviewed above do not fit neatly within it. Thus, for the purpose of completeness, I will evaluate the totality of plaintiff's evidence under the relevant ultimate inquiry. <u>Id.</u> ("In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?").

Plaintiff was fired by his supervisor (Cambra) and the human resources director (Mankowski), on the concurring recommendations of two higher-ranking executives (Powell and Elliot), who in turn relied on the human resources department's investigations and recommendation. Human resources personnel discussed whether plaintiff was ever going to change after repeated allegations and reports of his unprofessional and disrespectful behavior surfaced over a period of several months. The evidence shows that Cambra had made inappropriate jokes and insulting remarks about plaintiff's age in the past, but that when plaintiff was in trouble with HR because of other employees' complaints against him, Cambra stated that he believed plaintiff's performance had improved and that he had successfully completed the plan. Cambra even evinced surprise when Mankowski told him that she was recommending plaintiff's termination after her department had independently investigated the complaints and alleged incidents.

This evidence does not support a finding that intentional discrimination by Cambra or by anyone else was the but-for cause of plaintiff's discharge.  The evidence would not permit a reasonable factfinder to conclude that plaintiff was terminated because of his age.  Therefore, defendant's motion for summary judgment will be granted.


ORDER

IT IS ORDERED that

1. Defendant Capital One Services, LLC's motion for summary judgment, dkt. #24, is GRANTED.

2. The clerk of court is directed to dismiss plaintiff Herbert Freitag's claim and to close this case.

Entered this 23rd day of June, 2017.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge